**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| **In the Matter of the Search of** | ) |
| | ) |
| | ) Case No.  2:23mj1179-DBP |
| Data extracted from Apple iPhone IMEI | ) for Search Warrant |
| 352890113686480, extracted pursuant to | |
| Search Warrant 2:23-mj-272. | |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**UNDER RULE 41 FOR A SEARCH WARRANT**

I, Peter Maggio, being first duly sworn, declare and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Criminal Investigator/Special Agent ("SA") with the United States Department of the Interior, Bureau of Land Management ("BLM"). I am currently assigned to the BLM's Office of Law Enforcement and Security. I have been employed by the Department of Interior since 2003 and have been a law enforcement officer since 2006. My training and experience include conducting and assisting investigations of alleged criminal violations, including cases involving theft of government property, the Archeological Resource Protection Act, the Paleontological Resource Protection Act, narcotics trafficking and smuggling of cultural artifacts, narcotics, wildlife and plants. I have attended over 1,700 hours of law enforcement training including a nine-week Santa Rosa Community College Law Enforcement Ranger Academy in 2006, a 2009 17-week Land Management Police Training Program and a 2015 five-week Department of Interior Investigator Training Program, both of which were held at the Federal Law Enforcement

Training Center in Georgia. All these trainings included instruction in investigation of cultural and paleontological resource crimes, theft of government property, conspiracy, and destruction of government property. I have a Bachelor of Science in Recreation, Parks, Tourism and Administration. My current duties include investigating the theft of government property and cultural resource crimes, to include applying for and serving search warrants.

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – data from an electronic device – described in Attachment A, which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 16 U.S.C. § 470aaa-5 (exchange, transport, and trafficking offenses of the Paleontological Resources

Preservation Act)[1] and 18 U.S.C. § 641 (theft of public property - receiving, and retaining) (collectively, the "SUBJECT OFFENSES") have been committed by Steven WILLING and other persons known and unknown. There is also probable cause to search the data from the device described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## LOCATION TO BE SEARCHED AND IDENTIFICATION OF DEVICE

5.     The property to be searched is data extracted from Apple iPhone IMEI 352890113686480, extracted pursuant to Search Warrant 2:23-mj-272.

6.     The DATA is currently located in an evidence storage facility at the Bureau of Land Management Field Office in Saint George, Utah.

7.     The applied-for warrant would authorize the search and seizure of the DATA described in Attachment B.

## SUMMARY OF PROBABLE CAUSE

8.     In or around 2014, the BLM received tips about an illegal petrified dinosaur-bone trafficking operation in southeast Utah. The information implicated Vint Wade ("WADE") as a major buyer of dinosaur bones that had been illegally collected from BLM managed public lands. In early 2023, the service of search warrants on WADE's residence and an internationally-bound shipping container revealed over 20,000 pounds of suspected illegal dinosaur bones. The search warrant on WADE's residence and additional search

---

[1] The Paleontological Resources Preservation Act makes the removal, transportation, exportation, receiving, selling, and purchasing of paleontological resources taken from federal lands illegal. It is illegal to possess and sell paleontological resources collected from federal lands without authorization.

warrants on the email account and cellphone of WADE's wife, Donna Wade ("D. WADE"), disclosed business records showing the Wades had sold a large amount of dinosaur bones to WILLING, including a multi-year deal in 2021 for WILLING to purchase 28,000 pounds of dinosaur bone and other minerals for approximately $1,400,000. Investigation reveals that, as recently as February 2023, WILLING has been selling dinosaur bones labelled "Utah Dinosaur Bones" at a rock and gem show in Tucson, AZ. As of March 2023, WILLING has wired over $500,000 to the Wades' bank accounts. A subsequent subpoena of WILLING's cell phone records showed that WILLING has continued to communicate with the Wades via the DEVICE as recently as March 7, 2023. On March 22, 2023, law enforcement officers seized the DEVICE from WILLING's person in Long Beach, California, pursuant to a search warrant.

## PROBABLE CAUSE

### A.   Background Regarding Vint Wade's Trafficking of Dinosaur Bones

9.     In or around April 2014, the BLM received a tip from Informant 1 that Seller 1, Seller 2, and Vint WADE took part in an illegal dinosaur-bone trafficking operation.[2] The operation consisted of Seller 1 illegally collecting, excavating, and removing dinosaur bone from federal lands in Utah and then selling the raw materials to WADE. Subsequent subpoenas yielded significant cell phone communications between the three individuals as well as several personal checks paid by WADE to Seller 1 and Seller 2 in the cumulative

---

[2]  Informant 1 is being paid as an informant while working with the BLM. Over the course of his/her work with the BLM, Informant 1 has been paid approximately $250.

amount of $4,900 for "Rocks." Informant 1 also provided pictures of illegally collected dinosaur bone.

10.    In or around September 2016, BLM Ranger Greg Meuth issued mandatory appearance violations to Seller 3, Seller 4, and Seller 5 (who subsequently became Informant 2) for the illegal collection of dinosaur bone on BLM lands within the Canyon Country District Office in Utah.[3] During the investigation, Informant 2 admitted selling dinosaur bone to WADE for one dollar per pound. Informant 2 also told investigators that WADE sold and shipped the bone to China.

11.    In or around September 2016, the BLM received a report about Seller 6 collecting and selling dinosaur bone. The reporting party said Seller 6 was illegally collecting dinosaur bone from federal lands which Seller 6 allegedly cut, polished, and sold. The reporting party also said Seller 6 dug up and collected a large dinosaur bone on federal land near Cortez, Colorado, with other associates and sold it to WADE for $6,000. The BLM obtained a picture of the bone along with other dinosaur bones illegally collected from BLM lands.

12.    In or around 2019, the Grand County Sherriff's Office in Utah arrested Informant 2 and Seller 4 for drug-related activities. The Sherriff's Office informed the BLM that Informant 2 and Seller 4 were in possession of dinosaur bones and digging tools seized during the drug-related investigation. BLM Rangers Curtis Racker and Cody Marsh and BLM SA Mike Hauck investigated the incident and interviewed both individuals.

---

[3] Informant 2 was arrested by a state law enforcement agency for drug crimes in the past and is currently working as a cooperator for leniency on those charges. While the BLM has not paid Informant 2, he/she has been paid approximately $200 by state agencies.

Informant 2 and Seller 4 were eventually issued violation notices for removing paleontological and archaeological resources from BLM lands in Southeastern Utah. During an interview with Informant 2, Informant 2 admitted to the illegal collection and selling of dinosaur bone to WADE for years.

13.     From on or about October 6, 2021, to on or about January 27, 2022, BLM law enforcement officials communicated with Informant 1, who had firsthand knowledge about individuals who collected and sold dinosaur bone illegally obtained from BLM lands. Informant 1 said he/she was present when Seller 1 illegally collected dinosaur bone from BLM lands. Informant 1 said Seller 1 would call WADE on his cell phone when he had around five 5-gallon buckets of dinosaur bone and arrange a transaction. Informant 1 said he/she was present at 3090 S. Desert Rd, Moab, UT 84532 when WADE bought dinosaur bone from Seller 1 and other various sellers.

14.     Informant 2 asserts that, in or around 2021, Informant 2 illegally collected 80-100 pounds of dinosaur bone from BLM lands. Informant 2 reported he/she later sold the bone to WADE for $2,000 in cash. According to Informant 2, WADE placed the bone into plastic containers with other dinosaur bone he was stockpiling awaiting shipment to China. WADE filled 55-gallon barrels and larger white plastic containers with dinosaur bone and kept them at his residential property at 3090 Desert Road, Moab, Utah 84532 until WADE could arrange shipment to China.

B.     **The CONEX**

15.     From on or about February 16, 2022, to November 2022, BLM law enforcement officials communicated with Informants 1 and 2 who shared firsthand

knowledge about individuals who illegally collected and sold dinosaur bone from BLM lands. The informants admitted on multiple occasions between on or about February 16, 2022, and November 2022, to collecting dinosaur bone illegally from BLM lands, and selling it to both Seller 1 and WADE. Both informants have seen WADE place dinosaur bone into storage containers at his property in Moab, Utah.

16.     On or about November 8, 2022, a BLM law enforcement official observed WADE and WADE's spouse D. WADE moving approximately five large white plastic containers holding suspected dinosaur bone at their property in Moab.  At approximately 11:00 a.m. that morning, a tractor trailer truck hauling a Conex (the "CONEX") arrived at the property. The white plastic containers were loaded into the CONEX and the truck left the property with the CONEX. A BLM law enforcement official also saw at least eight blue 55-gallon barrels with suspected dinosaur bone that remained on the property.

17.     On or about November 17, 2022, BLM law enforcement officials obtained shipping documents for the CONEX. The documentation listed the shipper as Wade's Wood & Rock, a company owned and operated by WADE and D. WADE. The documentation listed the contents as "stone ware." The documentation listed the pickup location as 3090 Desert Road, Moab, Utah 84532, and the final delivery destination as China.

18.     On or about November 17, 2022, agents with Customs and Border Patrol ("CBP") notified BLM law enforcement that the CONEX had arrived at the Long Beach terminal in California. CBP confirmed that the CONEX had originated from WADE's property in Moab and that the shipper was Wade's Wood and Rocks.

19.     On or about December 6, 2022, CBP agents inspected the contents of the CONEX at the Long Beach terminal, and it was determined that the materials listed as "stone ware" were, in fact, fossilized dinosaur bone.  Alan Titus (a BLM paleontologist) and a BLM law enforcement official were present for the inspection.  Titus identified five containers of dinosaur bone, estimated to weigh 17,000 to 18,000 pounds.

20.     On or about December 7, 2022, CBP agents called phone number (435) 260-2032 which was listed on the shipping invoice and talked to D. WADE about the contents of CONEX. CBP agents asked D. WADE what the CONEX contained, and she stated it was mostly agate and a few pieces of jasper. CBP agents asked D. WADE if there was anything else in the CONEX and she indicated there was not. CBP then emailed wadesrocks@yahoo.com a PDF fillable form to verify D. WADE's statements. The form was digitally filled out, signed by "Donna Wade," and returned via the same email address. The form had the same basic information as her statements. The form listed the principal exporter/company name as "Wade's Wood & Rocks" located at 3090 S. Desert Rd, Moab, UT 84532. The form also listed the email address as wadesrocks@yahoo.com and the phone number as (435) 260-2032.

21.     On or about December 7, 2022, a BLM law enforcement official obtained a search warrant in the Central District of California for the CONEX (C.D. Cal. Case No. 2:22-MJ-04776). BLM law enforcement officials seized the five containers of dinosaur bone totaling 17,354 pounds and transported them back to Utah to be processed as evidence.



IMAGE 1 – CONTENTS OF THE CONEX

22.     On or about December 13, 2022, a BLM law enforcement official interviewed Informant 2 about the dinosaur bone Informant 2 had illegally collected from BLM administered lands in 2021 and sold to WADE. Informant 2 described several pieces in detail that matched the description of pieces found during the processing of the dinosaur bone seized pursuant to the California search warrant. For example, Informant 2 described a "leg" bone six to seven feet long with "knuckles" on both ends. The bone broke into four pieces when Informant 2 collected it. The leg bone had very articulated cell structure with "dots" in pink, yellow, red, and white. Three of the four bone segments are depicted here:

  

IMAGE 2A                    IMAGE 2B                    IMAGE 2C

23.     Informant 2 told WADE during their transaction that Informant 2 had collected the dinosaur bone from the Blue Hills area that is approximately 10 miles north of Moab, Utah, along the 138 road. This area consists of only BLM administered lands and Utah State Trust Lands. There is no private land in this area.

**c.   WADE'S PREMISES SEARCH**

24.     On or about January 10, 2023, BLM law enforcement officials served a search warrant on the WADE's residence in Moab, Utah. During the search, agents seized several thousand pounds of suspected stolen petrified dinosaur bones and business records dating back over ten years.

25.     A review of the business records revealed numerous paper receipts documenting WILLING as a purchaser of dinosaur bones from the WADEs. Those receipts include, but are not limited to:

a)      A February 4, 2016, invoice numbered 678653 to WILLING for the purchase of "Dino Bone" for $17,279.00. The invoice states $5,000 was paid by credit card and $12,279.00 was paid by check #1742.

b)      A January 20, 2019, invoice numbered 109090 to WILLING for 60 "Strands Dino Bone 6mm" for $1200.00, 39 "Dinosaur Bone 8mm" for $975.00 and various "Coprolite" (fossilized dinosaur feces).  A note on the receipt states "deducted from invoice #083939."

c)      A February 16, 2019, invoice numbered 004229 to WILLING for the purchase of "Dino Bone Rough" for $24,098 and $17,563 for "Remaining Bal Owed invoice #'s 083939 and 109090."

d)      A February 17, 2019, invoice numbered 004232 to WILLING for the purchase of "Dinosaur Bone" for $12,300.

## D.    DONNA WADE'S CELL PHONE SEARCH

26.    On or about January 11, 2023, law enforcement officials served a federal search warrant on D. WADE's cellular telephone, phone number (435) 260-2032. A search of the text messages on her phone revealed numerous text messages where D. WADE discussed the sale of the Wades' business and inventory to WILLING in 2021. On November 4, 2021, D. WADE sent a text message to a phone number identified in her phone as "Turq#8]turg Blue" stating, "We sold our business but the guy that bought us out will have a lot of new stuff in Tucson at the market place Steve Willing." On or about December 28, 2021, in text messages to a different person, D. WADE wrote that they sold to "STEVE WILLING," "he is at Market Place" and "Off of Oracle and Main."

27.     An internet search revealed that the Mineral and Fossil Marketplace is located at 1333 North Oracle Road, Tucson, AZ.

28.     Further search of the text messages on D. WADE'S phone revealed numerous messages to the phone number (310) 749-6465, the number assigned to the DEVICE. This phone number is identified as "Steve Willing" in D. WADE'S phone. Using a law enforcement database, I confirmed this phone number belongs to WILLING. In one set of text messages from on or about January 7, 2022, D. WADE provided WILLING with her bank name, routing number, and account number. WILLING texted in response, "Is the account under the name of Donna Wade?" D. WADE replied, "Yes." Approximately two hours later WILLING texted, "Wire was sent." A subpoena of D. WADE's bank account showed that on or about January 7, 2022, WILLING had transferred $141,000 into D. WADE's account. The subpoena also showed that on or about March 6, 2023, WILLING had transferred $359,250 into D. WADE's account.

### E.     DONNA WADE'S EMAIL SEARCH

29.     As set forth above, the email address listed on the CONEX shipping documents was wadesrocks@yahoo.com.  A search warrant was obtained for that email address.

30.     During the search of the historical emails in the account, a June 12, 2021, email was found that contained photos of a paper document titled "SALE AGREEMENT BETWEEN STEVE WILLING (BUYER) AND DONNA WADE (SELLER)." The document, which was signed by D. WADE, V. WADE and WILLING, states in part:

Buyer agrees to buy, and seller agrees to sell, their entire inventory of dinosaur bone and turquoise (and related products), unless specifically excluded. This includes approximately 28,000 pounds of dinosaur bone, and 14,000 pounds of turquoise. Included is also cabs, jewelry, knives, beads, petrified wood, carvings, turquoise chalk, compress turquoise, barrels of other stone, including lapis and tiger eye, deposits and prepayments for future shows in Quartzite [sic], Electric Park (Tucson), and Denver, and list of buyers and their contacts (if available), for 2 dinosaur bone spheres in buyer's possession, and for the seller's half interest in the turquoise bead deal currently in process with Tom Wen.

31.  The agreement listed the purchase price as $1,437,000, to be paid in four yearly installments of $359,250 beginning on February 15, 2022.

32.  In a November 18, 2021, email from steve@willingmosercpas.com to wadesrocks@yahoo.com, entitled "Proposed Ad," WILLING wrote, "Vint and Donna-what do you think? Vint and Donna Wade have sold all of their Dinosaur Bone and Turquoise Inventory to Dinosaur Bone Jewelry. They will be at our Tucson booths at: Mineral and Fossil Marketplace Jan 29-Feb 13 in the Container next to the Main House. GJX, Booths 1543 and 1544, in the main hall Feb 1-6, 2022. You are welcome to see our tremendous selection: Dinosaur Bone Beads and Caps, Turquoise Beads and Caps, Slabs, Polished pieces, Carvings, Jewelry, Natural Pieces, Spheres, Old and New Stock. Steve Willing  Steve@Willingmosercpas.com (310) 749-6465."

33.     An internet search for the venders at the Mineral and Fossil Market Place found a posting on xpopresse.com providing details about WILLING's business "Dinosaur Gem Bone & Turquoise," to include the purchase of WADE and D. WADE's dinosaur bone inventory.



IMAGE 3 – XPOPRESSE.COM REFERENCE TO DINOSAUR GEM BONE & TURQUOISE

### F.     FEBRUARY 2023 MINERAL AND FOSSIL MARKETPLACE

34.     On or about February 10, 2023, the Mineral and Fossil Marketplace was hosting an expo show. An undercover law enforcement officer (UC-1) attended the expo show and proceeded to WILLING's vendor booth.

35.     The vendor booth consisted of a large light-yellow Conex-style metal box. Inside the booth, there were shelves and glass cases with various displayed minerals,

dinosaur bones, dinosaur bone jewelry, containers, buckets, and boxes. Set up just outside the booth, but still part of WILLING's business, were multiple tables displaying items for sale including, but not limited to, dinosaur bones, lapis, turquoise, fossils, and agates.

36.     On one of the tables, UC-1 observed approximately eight red and yellow plastic bins containing fossilized dinosaur bones. The bins were labeled "Utah Dinosaur Bone." The prices were listed as "$32 now $16/lb."



IMAGE 4 – TABLE SET UP JUST OUTSIDE WILLING'S BOOTH

37.     On adjacent tables in close proximity, and again still part of WILLING's business, UC-1 further observed two plastic bins and three cardboard boxes containing several hundred cut slabs of dinosaur bone. The boxes were marked "Dinosaur slabs $1/gram" and the plastic bins were marked "Dinosaur Bone Slabs $1.00/g or $375/.lb." Underneath the tables were approximately a dozen white sandbag-style bags that were tied closed. Additional white sandbag-style bags were located at other tables outside the Conex-style box. A person working at the booth told UC-1 the bags under the table were filled with dinosaur bone that had come from Utah.



IMAGE 5 – WHITE BAGS CONTAINING MORE DINOSAUR BONE

38.     At the booth, UC-1 was able to speak with WILLING, who identified himself as the owner of the business. During the talk, WILLING made statements indicating he knew the bones were from Utah and stated that he had been collecting dinosaur bones for "a long time."

## H. WILLING PHONE RECORDS

39.     A subpoena of the call records of the DEVICE's phone number (310) 749-6465 revealed that between on or about January 3, 2023, and March 7, 2023, WILLING's phone number communicated with D. WADE's phone number five times, with the most recent communication occurring on or about March 7, 2023. The subpoena also revealed that between on or about September 6, 2022, and March 7, 2023, WILLING'S phone number communicated 158 times with WADE's phone number (435) 260-9349, the most recent communication occurring on or about March 7, 2023.

40.     A search of a law enforcement data base Accurint confirmed WILLING's phone number as (310) 749-6465.

## I. MARCH 21 AND 22, 2023 SEARCH WARRANTS

41.     Through further investigation, law enforcement officers determined that WILLING has a residence in Tucson, AZ and a residence in Culver City, CA.

42.     On March 16, 2023, law enforcement officers applied for search warrants in the District of Arizona for WILLING's Tucson, AZ residence and WILLING's vendor booth at the Mineral and Fossil Marketplace in Tucson, AZ. United States Magistrate Judge Eric J. Markovich issued those warrants on that same date. *See* 23-00178MB, 23-00177MB.  Law enforcement officers served those warrants on March 21, 2023, during which time the officers seized several thousand pounds of dinosaur bone.

43.     On March 20, 2023, law enforcement officers obtained a search warrant for WILLING's person in the Central District of California, Case No. 2:23-mj-01310, from United States Magistrate Judge Charles F. Eick, for the seizure of the DEVICE. Law

enforcement officers served that warrant on WILLING in Long Beach, California, on March 22, 2023. During the search, law enforcement officers seized the DEVICE from WILLING's person, as authorized.

44.     Law enforcement officers transported the DEVICE to the District of Utah. On March 28, 2023, law enforcement officers obtained a search warrant for the DEVICE in the District of Utah, Case No. 2:23-mj-272, from United States Magistrate Judge Daphne A. Oberg. Law enforcement officers serve that warrant on the DEVICE at the Intermountain West Regional Computer Forensics Laboratory (RCFL) in Salt Lake City, UT on March 29, 2023.

45.     During the search approximately 246 gigabits of data (the "DATA") were extracted from the DEVICE. The DATA was transported to the BLM evidence storage facility in Saint George, UT, where it is currently located.

46.     The DEVICE was returned to WILLING on April 7, 2023, after law enforcement officers confirmed the DATA had been successfully extracted.

47.     On, or about, April 1, 2023, law enforcement began to review the DATA. The DATA included, but was not limited to, a 3.1 gigabit 599,527-page PDF Cellbrite Extraction Report of the phone and over 100,000 photographs. The Extraction Report included thousands of text messages and instant message records from multiple applications, as well as geolocation information, contact lists and other forms of information.

48.     While attempting to review the DATA, law enforcement officer saw several photographs they recognized as a location outside of Moab, UT. The meta data for those

photographs showed they were taken on, or about, June 12, 2021. During a March 2023 interview Steve WILLING told investigators he had visited the WADEs in Moab around that same time frame.

49.     The large size of the Extraction Report, which was approximately 1.5% of the total volume of data, and the large amount of remaining data made the review all of WILLING's phone data difficult to do in a timely manner. For example, law enforcement officers attempted to review the Extraction Report using the Adobe Acrobat Pro program but found that a single word search took over three hours if no words were found and no information needed to be analyzed. Due to the inability to fully search the DATA, the DATA was set aside in mid-July 2023. No further searches or review of the DATA were conducted after, or about, the middle of July 2023.

50.     In, or about, the beginning of November 2023, law enforcement officers contact the Rocky Mountain Information Network (RMIN). RMIN is part of the Regional Information Sharing System (RISS) Program, a federal funded partner agency that supports law enforcement agencies. RISS has technical tools and analytical staff who are trained and capable of searching this amount of digital data. RISS offered their assistance with searching the DATA.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

51.     Based on my training and experience, I know that looting and trafficking of paleontological and cultural items is often a continuing activity, which lasts over months and many years. Repeated trafficking over lengthy periods of time generates greater amounts of evidence. Many items of evidentiary value, particularly documentary evidence,

are not illegal to possess and therefore not overly incriminating at first glance. Thus, even when these traffickers know they are being investigated, they rarely dispose of all items of evidentiary value, and searches against these suspects who have knowledge of the investigation have oftentimes yielded important evidence.

52.     Through my training and experience, I know that people who traffic in illicit material, including paleontological material, will use their cell phones to communicate with buyers and sellers. These communications may include, but are not limited to, prices and descriptions of items, dates of sale, photographs, methods of shipping and other transactional information.

53.     Based upon my training and experience, I know that the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media and security devices.

54.     Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a.     Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the

Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital

devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

55.     Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.     Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.     Digital devices capable of storing multiple gigabytes are now commonplace. One gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

## CONCLUSION

56.     For the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES, as described in Attachment B to this affidavit, will be found in a search of the DATA, which is more fully described in Attachment A.

57.     Because this warrant seeks only permission to examine data already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

PETER MAGGIO

Digitally signed by PETER MAGGIO
Date: 2023.12.14 11:35:17 -08'00'

PETER MAGGIO, Special Agent
Bureau of Land Management

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 this 14th day of December 2023.

_____

DUSTIN B. PEAD
UNITED STATES MAGISTRATE JUDGE